**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

**THE CHICKASAW NATION**,

     *Plaintiff*,

v.

1. **CVS CAREMARK, LLC**;
2. **CAREMARK PHC, LLC**;
3. **CAREMARK PCS HEALTH, LLC**;
4. **CAREMARK, LLC**;
5. **CAREMARK RX, LLC**;
6. **AETNA, INC.**;
7. **AETNA HEALTH, INC.**;
8. **OPTUMRX, INC.**;
9. **OPTUM, INC.**;
10. **UNITED HEALTHCARE SERVICES, INC.**; and
11. **UNITEDHEALTH GROUP, INC.**

     *Defendants*.

Civil Action No.  20-CV-488-KEW

**COMPLAINT**

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................3

II.    PARTIES ..............................................................................................................6

    A.     The Chickasaw Nation (Plaintiff) ...........................................................6

    B.     CVS Defendants.......................................................................................7

    C.     Optum Defendants .................................................................................11

III.   JURISDICTION AND VENUE .........................................................................13

IV.    LEGAL FRAMEWORK ....................................................................................14

    A.     Indian Health Service Provides Funding for the Nation's Healthcare..................14

    B.     The IHCIA Authorizes the Nation to Recoup from Third Parties the Cost of Services Provided to the Nation's Members .......................................17

V.     FACTUAL ALLEGATIONS ..............................................................................18

    A.     Defendants Profit from PBM Services at the Expense of Patient Care ................19

    B.     The Nation Operates ITU Pharmacies, Which Are Federally Exempt from Defendants' Schemes ......................................................................22

        1.     The Nation Is Entitled to Recoup Service Costs from Defendants under the Recovery Act ......................................................24

        2.     Defendants Are Subject to the Recovery Act ...........................25

    C.     Defendants Violate the Recovery Act.....................................................25

    D.     Defendants Leverage Discount Programs to Unlawfully Hinder the Nation's Recoupment Benefit................................................................27

        1.     Discount Programs Create Significant Profit for PBMs...........................27

        2.     ITU Pharmacies Traditionally Ignored Discount Programs ....................29

        3.     Defendants Inextricably Integrated Their Discount Program Information into Members' Insurance Information ...................29

4.      Defendants' Integrated Discount Program Information Forces the
         Nation to Either Pay or Forgo Recovery under the Recovery Act ............30

E.      Defendants Continually and Intentionally Refuse to Repay the Nation................34

F.      Defendants' Conduct Impairs the Quality of the Nation's Healthcare
         Program.........................................................................................................35

VI.    COUNTS.............................................................................................................36

VII.   PRAYER FOR RELIEF ......................................................................................41

VIII.  JURY DEMAND…………………………………………………………………...42

## I.    INTRODUCTION

1.    This case arises under federal laws[1] guaranteeing Native Americans access to healthcare. With the support of these laws, Plaintiff the Chickasaw Nation (the "Nation") has established a robust and sophisticated healthcare system, which includes several ITU Pharmacies[2] throughout the territory of the Chickasaw Nation. The Nation's ITU Pharmacies provide services to members of federally recognized Native American nations ("Members"), including many citizens of Oklahoma.

2.    Pursuant to federal law, Members are eligible to receive health care (including pharmacy services) at the Nation's facilities at no charge. The Member pays no co-pay or other fees for healthcare services, including prescription medications he or she receives from the Nation's ITU Pharmacies. However, the ITU Pharmacy must still pay for the costs of the medications it dispenses to Members. To offset these costs, the Nation has the right to recoup the costs of covered services the Nation provides to a Member from any applicable insurance coverage the Member may have. The Nation therefore enjoys the status of a "payor of last resort." Clear, unambiguous federal laws guarantee this right.

3.    Defendants ignore these laws. Defendants make up two of the largest vertically integrated pharmacy conglomerates in the U.S. They consist of captive Pharmacy Benefit

---

[1] 25 U.S.C. § 1621, *et seq*.; *see* Section IV—"Legal Framework", *infra*.

[2] "ITU Pharmacies" are those pharmacies operated by Indian Health Service ("IHS"), an Indian tribe or tribal organization, or an urban Indian organization, all of which are defined in Section 4 of the Indian Health Care Improvement Act ("IHCA"), 25 U.S.C. 1603. The Nation's pharmacies are ITU Pharmacies.

When a Member of any Nation visits an ITU Pharmacy (whether run by that Member's respective nation or another nation), that Member receives services for no charge, and that ITU Pharmacy has a 25 U.S.C. § 1621e right of recoupment against the Member's insurer (if the Member has coverage).

Managers ("PBMs"), along with large health insurance plans and networks. They provide and manage many of the insurance programs covering Members. The CVS Defendants[3] allocate a significant portion of their management services to (and derive a complementary proportion of revenue from) their captive pharmacy benefits plan under the subsidiary, Defendant Aetna. Similarly, the Optum Defendants[4] allocate a significant portion of their management services to (and derive a complementary proportion of revenue from) the pharmacy benefit plans of the Optum parent company—Defendant United Health Group. Of course, these relationships make up a respectively predominant portion of each of the CVS and United Health Group conglomerate's revenue stream and allow Defendants to exert significant and substantial control over the pharmacy market.

4.      In approximately 2015, the Nation's ITU Pharmacies began experiencing numerous and unprecedented claim denials. These denials emanated from Defendants' various PBM entities on behalf of the respective health benefits plans they managed (predominantly, Aetna and United Health Group plans). Defendants began denying claims—claims for covered drugs, for which the Nation had previously submitted and received reimbursement without issue—for reasons that have no applicability whatsoever to ITU Pharmacies. These denials were based on Defendants' retail pharmacy rules from which the Nation is exempt.[5] These claim denials violate specific provisions

---

[3] The "CVS Defendants" are Defendants CVS Caremark, LLC; Caremark PHC, LLC; CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; Caremark Rx, L.L.C.; Aetna, Inc.; and Aetna Health, Inc. *See* Section II—Parties, *infra*.

[4] The "Optum Defendants" are OptumRx, Inc.; OptumRx Holdings, LLC; Optum, Inc.; UnitedHealth Group, Inc.; and United Healthcare Services, Inc. *See* Section II—Parties, *infra*.

[5] *See* Section V.B., *infra*. These unlawful denials were based on many of Defendants' retail pharmacy rules, which are wholly inapplicable to ITU Pharmacies. These rules include but are not limited to requirements that (a) patients use a specialty pharmacy to fill certain prescriptions; (b) patients visit an in-network pharmacy; or (c) patients use a mail-order pharmacy. While these

of the 1976 Indian Health Care Improvement Act ("IHCIA") and deprive the Nation of critical healthcare funding. They impact the livelihood of some of the most vulnerable Native American Member-patients.

5.      In further violation of the law, Defendants employ a novel scheme whereby they effectively compel the Nation's ITU Pharmacies to participate in their many drug discount programs. Because Members pay no fee for their prescription medications and other pharmacy services at ITU Pharmacies, Defendants' discount programs create a loss for ITU Pharmacies. Discount program information was, until recently, separate and distinct from the insurance benefit information an ITU Pharmacy needed to file a reimbursement claim to the insurer. The ITU Pharmacy could avoid the forced loss by simply removing the discount information from a Member-patient's file. But now, Defendants have inextricably integrated discount program information with Member's insurance information. Therefore, the Nation must either (a) participate in the drug discount programs at a loss or (b) forgo reimbursement that is guaranteed and protected by federal law and essential to the Nation's healthcare budget. This constitutes an unlawful hindrance of the Nation's ability to avail itself of the federal recoupment provision. *See* 25 U.S.C. § 1621e(c).[6]

6.      Defendants knowingly, intentionally, and unjustifiably refuse to pay to the Nation the funds it is entitled to recoup for pharmaceutical benefits, medical devices, and other products and services provided to Members with Defendant-administered and/or -issued coverage.

---

requirements may be contractually valid between Defendants and a *retail* pharmacy, Defendants cannot deny reimbursement claims from ITU Pharmacies for these reasons. *See* 25 U.S.C. § 1621e.

[6] Reimbursement from insurers does not offset, reduce, or otherwise impact the amount of healthcare funding the Nation receives from other sources, including the federal Government. The funds Defendants wrongfully withhold from the Nation would otherwise increase the Nation's healthcare budget and allow it to serve its at-need population. Defendants thereby act in direct contravention of federal policy promoting health care for Native Americans.

Defendants blatantly and intentionally ignore their legal obligation to the Nation. They have, for years, ignored the Nation's requests for both repayment and explanation.

7.     After myriad attempts to resolve Defendants' wrongs, the Nation now seeks relief from this Court in the form of payment of all withheld costs of pharmaceutical benefit services the Nation provided, and continues to provide, to Members from Defendants—as insuring and/or administering the insurance plans of those Members—as well as equitable relief to prevent the Defendants' wrongful acts from continuing.

## II.     PARTIES

### A.     The Chickasaw Nation (Plaintiff)

8.     The **Chickasaw Nation** (the "Nation") is a sovereign and federally recognized Native American tribal nation headquartered at 520 E. Arlington Street, Ada, Oklahoma 74820. The Nation has a vibrant and unique cultural heritage, along with a strong tradition of organized self-government. The Nation pursues its stated mission of enhancing the overall quality of life of the Chickasaw people in part through its healthcare system. Through perseverance and extraordinary effort, along with the support of federal funding and recoupment from insurers under 25 U.S.C. § 1621e, the Nation has developed a comprehensive healthcare system, which includes several ITU Pharmacies throughout the Nation and located in the State of Oklahoma. In accordance with the intent of federal programs supporting the Nation, the Nation's ITU Pharmacies provide prescription medications (and even the most expensive specialty medications) at absolutely no cost to Members. This is supported by the recoupment provisions codified in 25 U.S.C. § 1621e, as explained in Section IV, *infra*.

**B.     CVS Defendants**

9.      The pharmacy conglomerate operating under the brand "CVS" is one of the largest companies in the U.S. It is currently listed as number five in the Fortune 500 list.[7] CVS is a vertically integrated healthcare company: it operates one of the nation's largest retail pharmacy network, owns the largest PBM—Caremark, and is the nation's largest provider of individual Part D prescription drug plans, with over 7.6 million enrollees as of 2019. The CVS conglomerate earns billions of dollars in annual revenue.

10.      In acquiring Aetna in 2018, CVS purchased the nation's third-largest health-insurance company and fourth-largest individual Part D insurer. Aetna was required to sell off its standalone Medicare D prescription drug plan as part of the merger. Aetna sold it to WellCare, and CVS Caremark is now  the PBM and third-party administrator for WellCare.

11.      The CVS conglomerate is wholly owned and controlled by the holding company CVS Health Corporation.[8]

12.      As used throughout this Complaint, the "CVS Defendants" are Defendants CVS Caremark, LLC; Caremark PHC, LLC; CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; Caremark Rx, L.L.C.; Aetna, Inc.; and Aetna Health, Inc. On information and belief, each is a wholly owned subsidiary of the CVS Health Corporation holding company or one of CVS Health Corporation's wholly owned subsidiaries.[9]

13.      Defendant CaremarkPCS Health, L.L.C. and Caremark L.L.C. are agents and/or alter egos of Defendant Caremark Rx, L.L.C., and Defendant Caremark Rx, L.L.C. is an agent

---

[7] *See* Fortune 500 List, available at https://fortune.com/fortune500/ (last visited Aug. 4, 2020).

[8] *See* CVS Health Corporation SEC Form 10-k for fiscal year ended Dec. 31, 2019, available at https://www.sec.gov/ (last visited Aug. 09, 2020).

[9] *See Id.*

and/or alter ego of CVS Health. For example, Jonathan C. Roberts, CEO of Caremark Rx, L.L.C., is Executive Vice President and Chief Operating Officer of CVS Health Corporation. Thomas S. Moffatt, Secretary of Caremark Rx, L.L.C. and Caremark, L.L.C., is a Vice President, Assistant Secretary, and Assistant General Counsel at CVS Health Corporation. Anne E. Klis, CEO of Caremark, L.L.C., is Vice President of Professional Practice and Training at CVS Health Corporation. Daniel P. Davison, CEO of CaremarkPCS Health, L.L.C., is Senior Vice President of Finance at CVS Health Corporation. Melanie K. Luker, Assistant Secretary of CaremarkPCS Health, L.L.C., is Manager of Corporate Services at CVS Health Corporation.

### 1.    Defendant CVS Caremark, LLC

14.    Defendant **CVS Caremark, LLC** ("CVS Caremark") is the PBM and third-party administrator subsidiary of CVS Health; it administers pharmacy benefits for insurance companies, managed care organizations, and public and private health plans and organizations.

15.    In March 2007, Caremark merged with CVS Corporation to create CVS Caremark, later re-branded under the CVS Health catch-all holding company. Today, CVS Caremark controls approximately thirty percent (30%) of the U.S. PBM market.

16.    As a PBM and third-party administrator, CVS Caremark is solely responsible for managing its clients' plans in accordance with each plan's provisions. Each plan has benefits and restrictions, such as only covering prescriptions filled at certain pharmacies.

17.    CVS Caremark is a Delaware limited liability company and an immediate or indirect parent of many subsidiaries, including pharmacy benefit management and mail order subsidiaries.

####    2.    Defendant Caremark PHC, LLC

18.    Defendant Caremark PHC, LLC ("Caremark PHC") is a limited liability corporation that is a wholly owned subsidiary of CVS Health. On information and belief, Caremark PHC, LLC is part of CVS Health's PBM business model.

19.    Caremark PHC is registered to do business in Oklahoma and may be served with process through its registered agent, The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma, 73128.

####    3.    Defendant Caremark PCS, LLC

20.    Defendant CaremarkPCS Health, L.L.C., formerly known as Caremark PCS Health, L.P., is a Delaware limited liability corporation. It was incorporated in 2002 and is headquartered at 750 West John Carpenter Freeway, Irving, Texas 75039. CaremarkPCS Health, L.L.C., d/b/a CVS Caremark, provides pharmacy benefit management services to various health insurance entities. CaremarkPCS Health, LLC is a wholly owned subsidiary of CVS Health.

21.    Caremark PCS Health, LLC is registered to do business in Oklahoma and may be served with process through its registered agent, The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma, 73128.

####    4.    Defendant Caremark, LLC

22.    Defendant Caremark, L.L.C., a California limited liability company, is headquartered at 2211 Sanders Road, Northbrook, Illinois 60062-6128. Caremark, L.L.C. offers pharmacy benefit management services to various health insurance entities. Caremark, L.L.C. is a wholly owned subsidiary of CVS Health Corporation.

23.    Caremark, LLC is registered to do business in Oklahoma and may be served with process through its registered agent, The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma, 73128.

**5.      Defendant Caremark RX, LLC**

24.      Defendant Caremark Rx, L.L.C., a Delaware limited liability company, is headquartered at 211 Commerce Street, Nashville, Tennessee 37201. Caremark Rx, L.L.C. provides pharmacy benefit management services. Caremark Rx, L.L.C. is a wholly owned subsidiary of CVS Health Corporation. Caremark Rx, L.L.C. is the parent of Defendant CVS Health Corporation's pharmacy services subsidiaries and is the immediate or indirect parent of many pharmacy benefit management subsidiaries, including Defendant CaremarkPCS Health, L.L.C.

**6.      Defendant Aetna, Inc.**

25.      "Aetna" is the brand name for insurance products issued by the subsidiary insurance companies controlled by Defendant Aetna, Inc. Aetna was merged into the CVS conglomerate in 2018.

26.      Aetna, Inc. offers employee health benefit plans insuring Members. Aetna's Health benefits and health insurance plans are offered and/or underwritten by Aetna Health, Inc., et al. On November 28, 2018, CVS completed its acquisition of Aetna.

27.      Aetna, Inc. is responsible for denying the Nation's claims under 25 U.S.C. § 1621e by means of its parents CVS Caremark and CVS Health's PBM.

28.      Aetna, Inc. is headquartered at 151 Farmington Avenue, Hartford, Connecticut 06156.

**7.      Defendant Aetna Health, Inc.**

29.      Aetna Health, Inc. is a licensed insurer in Oklahoma. It may be served with process through its registered agent, The Corporation Company, at 1833 South Morgan Road, Oklahoma City, Oklahoma 73128.

### C.      Optum Defendants

30.      Optum is a branded part of UnitedHealth Group Incorporated, a for-profit managed health care company based in Minnetonka, Minnesota.[10]

31.      Defendant UnitedHealth Group Inc. has two main divisions: UnitedHealthcare, which provides health benefits, and Optum, which provides health services, including pharmacy benefit management services.

32.      In 2011, United Health Group formed the Optum brand by merging its existing pharmacy and care delivery services into the single unit, comprised of three main businesses: OptumHealth, OptumInsight, and Defendant OptumRx (UnitedHealth Group's PBM). Through its Optum brand, the company focuses on data and analytics, pharmacy care services, population health, healthcare delivery and healthcare operations.

33.      The "Optum Defendants" are OptumRx, Inc.; OptumRx Holdings, LLC; Optum, Inc.; UnitedHealth Group, Inc.; and United Healthcare Services, Inc.

### 1.      Defendant OptumRX, Inc.

34.      Defendant OptumRX, Inc. ("OptumRX") is UnitedHealth Group's pharmacy benefit manager and care services group. It operates across 150 countries in North America, South America, Europe, Asia Pacific, and the Middle East. OptumRX is the pharmacy benefit services subsidiary of UnitedHealth Group, Inc. OptumRx holds approximately 23% of the U.S. PBM market.

---

[10] *See* UnitedHealth Group Incorporated SEC Form 10-k for fiscal year ended December 31, 2019, available at https://www.sec.gov (last visited Aug. 1, 2020).

35.     OptumRX is responsible for issuing unlawful denials of the Nation's claims under 25 U.S.C. § 1621e on behalf of its parent UnitedHealth Group's various insurance benefits plans, as well as other plans OptumRX manages for other insurers.

36.      OptumRX is a California corporation. Its principal place of business is the UnitedHealth Group headquarters in Minnetonka, Minnesota. OptumRX is registered to do business in Oklahoma and may be served with process through its registered agent, The Corporation Company, at 1833 S. Morgan Road, Oklahoma City, Oklahoma 73128.

**2.     Defendant United HealthCare Services, Inc.**

37.     Defendant United HealthCare Services, Inc. is headquartered at 9700 Health Care Lane, Minnetonka, Minnesota and incorporated in Minnesota. United HealthCare Services, Inc. is a subsidiary of Defendant UnitedHealth Group, Inc. and provides pharmacy benefit management services through its subsidiaries to various health insurance entities. According to Exhibit 21.1 to UnitedHealth Group Incorporated's 2016 Securities and Exchange Commission Form 10-K, United HealthCare Services, Inc. also does business as Optum, Inc.

**3.     Defendant Optum, Inc.**

38.     Optum, Inc. is a PBM headquartered at 11000 Optum Circle, Eden Prairie, Minnesota and incorporated in Delaware. Optum, Inc. is a subsidiary of UnitedHealthcare Services, Inc., which provides pharmacy benefit management services through its subsidiaries to various health insurance entities on behalf of more than 65 million plan participants.

**4.     Defendant OptumRx Holdings, LLC**

39.     OptumRx Holdings, LLC is headquartered at 11000 Optum Circle, Eden Prairie, Minnesota, 55344-2503.

     **5.**     **Defendant UnitedHealth Group, Inc.**

40.     UnitedHealth Group's various insurance benefits plans unlawfully denied the Nation's claims under 25 U.S.C. § 1621e by means of its captive PBM, Defendant OptumRX.

41.     UnitedHealth Group, Inc. is a Delaware corporation with its principle place of business in Minnetonka, Minnesota.

### III.     JURISDICTION AND VENUE

42.     This Court may properly exercise jurisdiction over the subject matter of this suit under 28 U.S.C. § 1331 as the case arises under the IHCIA (*see* Section IV, *infra*) and 25 U.S.C. § 1621, *et al*. Furthermore, this Court may properly exercise jurisdiction over the subject matter of this suit under 28 U.S.C. § 1362, as this matter is brought by a federally recognized Native American Nation.

43.     This Court may properly exercise jurisdiction over the parties to this suit. The Nation consents to this Court's exercise of jurisdiction over it for the purposes of this suit. Defendants have sufficient minimum contacts with the State of Oklahoma, including but not limited to the marketing, sale, and execution of contracts for PBM services in Oklahoma, as well as the repeated denial of claims for recoupment of costs of goods and services (a) provided by the Nation to Members in Oklahoma and (b) sent to Defendants' from Oklahoma. Defendants have purposefully availed themselves of the privilege of conducting business in Oklahoma such that they are subject to suit here. Additionally, Defendants have targeted their wrongful conduct at Members of the Nation in Oklahoma. The Nation's claims arise out of and relate to Defendants' contacts with the State. This Court's exercise of jurisdiction is reasonable; the maintenance of this suit does not offend traditional notions of fair play and substantial justice.

44.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391. This action arises out of events, acts, and omissions that occurred in the Eastern District of Oklahoma.

Specifically, the Nation provided services to its Members through its ITU Pharmacies in this District. Those services gave rise to the Nation's claims for reimbursement from Defendants and Defendants' legal obligation to pay the Nation for those services rendered in this District. The Nation sent those claims to Defendants from this District, and Defendants disseminated their unlawful denials to the Nation in this District. Defendants' failure to pay the Nation's claim for reimbursement is the subject of this action.

**IV.      LEGAL FRAMEWORK**

45.     The Federal Government's obligation to provide for, maintain, and improve the health of Native Americans is manifest and inherent to Congress's federal trust responsibility for Native American nations. *See* 25 U.S.C. § 1601. It is grounded in both moral imperative and public health necessity. *See id.* To that end, Congress has passed several laws that guarantee Native Americans access to healthcare and provide Native American nations the financial support they require to develop and implement robust healthcare programs. This suit arises from Defendants' unlawful and unconscionable disregard of these laws.

46.     This section describes in detail the mechanisms through which the federal government provides funding to the Nation for healthcare services and has empowered the Nation to build its own sophisticated healthcare system. This section then proceeds to explain the federally enacted recoupment mechanism codified in 25 U.S.C. § 1621e, whereby the Nation may recover the cost of healthcare services it provides Members from third-parties responsible for those Members' coverage.

**A.      Indian Health Service Provides Funding for the Nation's Healthcare**

47.     Indian Health Service ("IHS") is a federal agency within the Department of Health and Human Services that is responsible for providing health care and medical services to federally recognized Native American nations. IHS is not a health insurance program; rather, it is a federally

funded health service provider akin to the Veterans Health Administration that provides health services directly to beneficiaries or in conjunction with Native American nations.[11]

48.     IHS strives "to raise the physical, mental, social, and spiritual health of [Native Americans] to the highest level" and "to assure that comprehensive, culturally acceptable personal and public health services are available and accessible to [Native American] people."[12] All actions IHS carries out are "directed toward developing an efficient and effective health care delivery system and promoting [Native American] participation and management of their own health care systems."[13]

49.     IHS provides this critical funding in two ways: (1) IHS provides services to Native American nations directly, and/or (2) IHS provides funding and support to Native American nations that have the ability to provide the services themselves.

50.     Over the past several decades, many Native American nations have moved away from IHS-controlled health care toward systems they control and direct themselves. Under the 1975 Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. § 5301, *et seq.*, nations may assume control over the management of their health care by negotiating "self-determination contracts" with IHS.[14] The ISDEAA reflects modern federal policy of tribal self-

---

[11] IHS is one of four similar foundational federal health delivery systems: IHS, Veterans Health Administration, Defense Health Agency, and Bureau of Prisons Health Services Division.

[12] Indian Health Services, available at https://www.ihs.gov/aboutihs/ (last visited Feb. 28, 2020).

[13] *Id*.

[14] 25 U.S.C. § 5304(j) (2012) (defining "self-determination contract" as "a contract (or grant or cooperative agreement utilized under section 5308 of this title) entered into under subchapter I of this subchapter between a tribal organization and the appropriate secretary for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law").

determination, whereby nations may build the capacity to perform essential governmental functions, improve the programs themselves, and respond directly to their own needs.[15]

51.     One can find no better example of self-determination than the Chickasaw Nation Department of Health's network of robust and sophisticated health clinics and ITU Pharmacies, which the Nation developed pursuant to its Title V Self-Governance Compact.

52.     In furtherance of ISDEAA policy, Congress enacted the Indian Health Care Improvement Act ("IHCIA") in 1976 to assist Native American nations with their health initiatives.[16] The IHCIA was designed to enhance access to and quality of health care services for Native Americans. In fact, the IHCIA was the first federal legislation to enact specific statutory programs for Native American healthcare. In the IHCIA, as amended, Congress established a national policy intended to ameliorate long-standing health care disparities and to provide increased and more effective health care services to Native Americans.

53.     The IHCIA is the cornerstone legal authority for the provision of health care to Native Americans. Notably, the IHCIA amended the Social Security Act to permit reimbursement by Medicare and Medicaid for services provided to Native Americans in IHS and tribal health care facilities. In doing so, Congress recognized that many Native Americans, especially those residing in very remote and rural locations, were eligible for but could not access federally-funded healthcare services without traveling sometimes hundreds of miles to qualified providers located

---

[15] Under Title I of the ISDEAA, a nation may contract with IHS to conduct and administer certain portions of its health program which were previously operated by IHS ("Title I Self-Determination Contracting"). Under Title V, a nation can exercise more independence by taking over the operation of its health program in its entirety ("Title V Self-Governance Compacting"). Under both Title I Contracts and Title V Compacts, IHS continues to fund all health services. These methods are not mutually exclusive. These are collectively referred to as "638 Compacts" after Public Law 93-638 (*i.e.*, the ISDEAA).

[16] The 2010 Affordable Care Act (P.L. 110-148) significantly reorganized and permanently reauthorized the IHCIA.

off reservation: "[f]ederal health services to maintain and improve the health of the [Native Americans] are consonant with and required by the Federal Government's historical and unique legal relationship with and resulting responsibility to the American Indian people." 25 U.S.C. § 1601(1). And, the IHCIA provides a key reimbursement mechanism to help nations offset the cost of implementing these important polices.

**B.    The IHCIA Authorizes the Nation to Recoup from Third Parties the Cost of Services Provided to the Nation's Members**

54.    Native Americans need not pay for health care services they receive from eligible providers. Members of any nation who visit the Nation's ITU Pharmacies pay no co-pay or other fee for their prescription medications and medical devices.

55.    To offset the cost of this important privilege, the Nation benefits from an essential policy of reimbursement and cost recovery from responsible third parties who stand in an inferior (*i.e.*, more immediate) priority of payment—like Defendants—pursuant to IHCIA Section 206, codified at 25 U.S.C. § 1621e (referred to herein as the "Recovery Act"). Simply put, the Recovery Act permits Native American nations to recoup the cost of services they provide Members from any applicable insurance coverage the Member may have. In this regard, the Nation is a payor of last resort. 25 U.S.C. § 1623. The Recovery Act provides:

> the United States, an Indian tribe, or tribal organization shall have the right to recover from an insurance company, health maintenance organization, employee benefit plan, third-party tortfeasor, or any other responsible or liable third party (including a political subdivision or local governmental entity of a State) the reasonable charges billed by the Secretary, an Indian tribe, or tribal organization in providing health services through the Service, an Indian tribe, or tribal organization, or, if higher, the highest amount the third-party would pay for care and services furnished by providers other than governmental entities, to any individual to the same extent that such individual, or any non-governmental provider of such services, would be eligible to receive damages, reimbursement, or indemnification for such charges or expenses if—
>
> > (1) such services had been provided by a non-governmental provider; and

> (2) such individual had been required to pay such charges or expenses and did pay such charges or expenses.

25 U.S.C. § 1621e(a). The right to recover such costs may not be hindered by any policy provision. *Id*. § 1621e(c). This right may not be extinguished by specific plans requirements, such as network participation and/or exclusion from network. Nor may the right be abridged by contract. *Id*. The Recovery Act further provides:

> No law of any State, or of any political subdivision of a State and no provision of any contract, insurance or health maintenance organization policy, employee benefit plan, self-insurance plan, managed care plan, or other health care plan or program entered into or renewed after November 23, 1988, shall prevent or hinder the right of recovery of the United States, an Indian tribe, or tribal organization under subsection (a).[17]

56.   The Nation has standing to bring an action to redress Defendants' denial of its recovery of costs under the Recovery Act. *Id*. § 1621e(e). This include standing to sue for equitable relief. *Id*.

57.   Prevailing plaintiffs under the Recovery Act are authorized to recover reasonable attorney fees and costs of litigation. *Id*. § 1621e(g).

58.   The applicable statute of limitations is six years before commencement of this action. *Id*. § 1621e(j).

## V.   FACTUAL ALLEGATIONS

59.   Defendants have constructed their PBM business models to pad their pockets at the expense of the quality of patient care. Their efforts to increase revenues and expand their profit

---

[17] Since 2005, the Chickasaw Nation Department of Health has acted under a Provider Agreement with Defendants' various PBM entities. These provider agreement permits the Chickasaw ITU Pharmacy to submit claims for clients covered by Defendant-managed benefit plans. The Nation does not bring suit under these contracts, or any other contract. Rather, the Nation brings suit under 25 U.S.C. § 1621e, which creates a private right of action for the Nation in this regard.

margins cut against the integrity of the American healthcare system by forcing retail pharmacy patients to bend to an array of specialty pharmacy, mail order pharmacy, and in-network pharmacy requirements. This case arises from Defendants' attempts to bend the Nation to these retail tactics, from which the Nation is federally protected.

60.     Defendants exemplify the way PBMs gobble up the various plans they manage (or *vice versa*) and impose cost-cutting, profit driven burdens on their beneficiaries. In this regard, they have become the poster child for the conflicts plaguing the corporate practice of medicine in the U.S.

61.     Fortunately, federal law insulates the Nation from many of the greed-driven tactics Defendants employ in the retail setting.[18] However, Defendants blatantly ignore these protections by denying the Nation's claims for recovery of service costs under the Recovery Act. Such conduct is in direct violation of federal law and deprives the Nation of its ability to effectively provide healthcare and prescription medications to its Members.

62.     Defendants go even farther by imposing their discount programs on the Nation, which frequently result in a loss to the Nation. Defendants' discount programs thereby prevent and/or hinder the flow of funding to the Nation's healthcare system in direct contravention of federal policy and the Recovery Act § 1621e(c).

**A.      Defendants Profit from PBM Services at the Expense of Patient Care**

63.     PBMs today exemplify the ways in which the corporate practice of medicine, driven by greed, corrupts the integrity of patient care. This case arises out of Defendants' refusal to

---

[18] Throughout this Complaint, the Nation refers to "the retail pharmacy setting" to mean the typical experience of a customer, whether paying in cash or benefitting from insurance coverage, who visits a retail pharmacy open to the public (*e.g.*, a CVS retail pharmacy), as compared and contrasted to a Member visiting an ITU Pharmacy.

comply with the Recovery Act in an effort to subject the Nation to their usual retail profit-driven tactics, from which the Nation is protected by federal law.

64.    PBMs are third-party administrators of prescription drug programs for commercial health plans, self-insured employer plans, Medicare Part D plans, and government employee plans. PBMs bill themselves as the "middlemen" between pharmacies, insurers, and drug manufacturers. In reality, PBMs leverage substantial influence over the breadth of the prescription drug market and reap great profits from this control.

65.    PBMs, in managing pharmacy benefit plans, are primarily responsible for developing and maintaining the plan's formulary[19], contracting with pharmacies, negotiating discounts and rebates with drug manufacturers, and processing and paying prescription drug claims for the plan's insureds. PBMs operate inside of integrated healthcare systems, as part of retail pharmacies, and as part of insurance companies. PBMs are the gatekeepers to the vast majority of prescription drugs filled in the U.S. Patients purchase (or insurers reimburse) over 80% of pharmaceuticals through PBM networks. In 2019, Defendants controlled approximately fifty-three percent (53%) of the PBM market.[20]

66.    Generally, health insurers contract with PBMs to manage their pharmaceutical costs. The PBM then assumes management of prescription drug benefits on behalf of the insurer. PBMs help health plans negotiate payment rates with manufacturers through the use of formularies and utilization management tools. In addition to contracting with commercial health plans, PBMs

---

[19] A formulary is a list of generic and brand name prescription drugs covered by a specific health insurance plan. Generally, a drug on the plan's formulary is covered by the plan, while a drug absent from the formulary is not.

[20] Adam Fein, Ph.D, *CVS, Express Scripts, and the Evolution of the PBM Business Model*, Drug Channels Institute (May 29, 2019).

contract with state Medicaid departments and with commercial health plans to provide drug coverage for employer-sponsored plans, exchange plans, and Medicare Part D enrollees.

67.     The last decade has witnessed significant vertical integration on the part of PBMs, who increase revenues, expand their profit margin, and exert even greater market control by absorbing into their business model the benefit plans they manage along with vast networks of retail and online pharmacies. When criticized for their tactics, PBMs feign innocence as the "mere middlemen" between pharmacies, insurers, and drug manufacturers. Historically, PBMs have indeed generated some benefit for patients and insurers by leveraging their size to negotiate rebate and discount contracts between drug manufacturers and retail outlets. However, corporate greed has changed the face of pharmacy benefits in the U.S. for the worse. The PBM market has become a highly consolidated industry plagued by the problems common to the corporate practice of medicine—namely, the undercutting of patients' best interests to pad the PBM's bottom line.

68.     Defendants operate two of the largest PBMs, and they have grown that way by integrating their business models with the insurance programs they once served. Insurers have acquired profitable PBMs (and *vice versa*) to leverage greater control over drug prices (*e.g.*, to maximize profit, PBMs now position themselves to benefit from higher drug pricing, manufacturer rebates, and other incentives without passing those benefits to the patient).[21] This is neither novel nor latent, as PBMs have become synonymous with profit driven healthcare management:

> In the sea of America's health-care system, pharmacy benefit managers tend to be seen as destructive leviathans. Invisible to everyday patients, PBMs lurk beneath health-insurance companies and swim through nearly every prescription-drug transaction. They squeeze rebates out of drug manufacturers, pass most—but not all—of those rebates on to health insurers, pay the pharmacy for the drugs, and

---

[21] For example, in March 2007, Caremark merged with CVS Corporation to create CVS Caremark, later re-branded as CVS Health. Cigna purchased Express Scripts on December 20, 2018. UnitedHealth acquired PacifiCare in 2005 and siloed the PBM component into what is now called OptumRX.

collect payments from the insurer. In doing so, they subtly shape the currents of American health care.[22]

## B.   The Nation Operates ITU Pharmacies, Which Are Federally Exempt from Defendants' Schemes

69.     This case arises in part under fundamental differences between retail pharmacies (which are subject to significant PBM control) and ITU Pharmacies (which benefit from federal protections from PBM tactics).

70.     Generally, in the retail setting, the PBM claims process works as follows: first, a healthcare provider issues a prescription to a patient. The prescription is sent or taken to a pharmacy. The Pharmacy first checks the prescription with the patient's insurance provider's PBM. The PBM receives the claim, verifies the patient information vis-à-vis the patient's insurance provider, confirms eligibility, and returns either a denial or payment information to the pharmacy. Concurrently, the pharmacist electronically enters and submits a claim to a "switch," which automatically sends the claim to the PBM responsible for managing the patient's pharmacy benefits. If the PBM returns the prescription as "payable" under the plan, the pharmacist prepares (or "fills") the patient's prescription. The patient receives the filled prescription from the pharmacist and may pay a co-pay according to the terms of his or her insurance coverage. The PBM then sends a bill to the patient's insurer for the prescription pursuant to its management contract with the insurer.

71.     With the typical retail patient-customer, the PBM has the right to enforce certain restrictions pursuant to the insured's plan. The PBM may deny claims for payment from a retail pharmacy based on requirements including (but not limited to) the patient visit only in-network

---

[22] Olga Khazan, *Invisible Middlemen Are Slowing Down American Health Care*, The Atlantic (April 9, 2019).

pharmacies to receive benefits, visit specialty pharmacies to receive specialty medications, and/or avail themselves of mail-order pharmacies for certain "mail order only" drugs. PBMs routinely deny claims for *retail* pharmacy customers based on the customer's insurance plan rules.

72.     However, the pharmacy process differs substantially for Members visiting the Nation's ITU Pharmacies (as well as any other Nations' ITU Pharmacies), which benefit from the support and protections of the Recovery Act. PBMs have no authority to restrict or otherwise decline reimbursement to the Nation for the costs of goods and services provided by the Nation's pharmacies to its Members if the drug is covered under the PBM's formulary for the Member's insurance coverage at any "in network" pharmacy.

73.     The Nation operates ITU Pharmacies[23], which are subject to the IHCIA under a "638 Compact."[24] As such, the Nation's ITU Pharmacies benefit from the protection of the Recovery Act. The Nation is therefore entitled to recover their "reasonable billed charges, or, if higher, the highest amount the third party would pay for care and services furnished by providers other than governmental entities..."25 U.S.C. § 1621e(a).

---

[23] Each of the Nation's pharmacies is an ITU "Tribal Facility" as defined by 25 U.S.C. § 1603. An IHS/Tribal/Urban Indian Health ("I/T/U" or "ITU") Pharmacy means a pharmacy operated by the Indian Health Service, an Indian tribe or tribal organization, or an urban Indian organization, all of which are defined in Section 4 of the IHCIA, 25 U.S.C. § 1603. ITU Pharmacies carry the taxonomy "332800000X" The Nation's ITU Pharmacies include the Ardmore Health Clinic, Ardmore, Oklahoma; The Chickasaw Nation Medical Center, Ada, Oklahoma; Purcell Health Clinic, Purcell, Oklahoma; Tishomingo Health Clinic, Tishomingo, Oklahoma. Additionally, the Chickasaw Nation Department of Health operates the Chickasaw Nation Online Pharmacy Refill Center.

[24] *See* Note 15, *supra*.

1.   **The Nation Is Entitled to Recoup Service Costs from Defendants under the Recovery Act**

74.   The pharmacy experience for a Member of the Nation is different from the average retail patient-consumer.[25] When a Member of a Nation visits one of the Nation's ITU Pharmacies to fill a prescription, the Member receives his or her prescription medication at no cost. The Nation, by virtue of its various healthcare programs, uses federal funding through IHS to provide medications to its Members for free. This includes costly specialty medications (*e.g*., oncology medications), which may be subject to special requirement (*e.g.,* specialty pharmacy or mail order pharmacy) in the retail setting. The Member pays neither a copay nor a portion of the cost of the prescription medication.

75.   However, in addition to the benefits of federally funded healthcare that is each Member's birth right, many Members have insurance coverage. Most often, the Member receives this coverage through participation in his or her employer's benefits program. Because the Nation is a payor of last resort[26], the Member's insurance coverage becomes responsible for the cost of medications dispensed at the Nation's ITU Pharmacies. Pursuant to the Recovery Act, if the Member has insurance coverage, the Nation is entitled to recoup the cost of the medications provided to the Member if medication falls within the formulary of the Member's plan. 25 U.S.C. § 1621e.

---

[25] *See* Section V.B., *supra*.

[26] *See* Section IV—"Legal Framework", *supra*; *see also* 25 U.S.C. § 1632, which provides "Health programs operated by the Indian Health Service, Indian tribes, tribal organizations, and Urban Indian organizations (as those terms are defined in section 4 of the Indian Health Care Improvement Act (25 U.S.C. § 1603)) shall be the payer of last resort for services provided by such Service, tribes, or organizations to individuals eligible for services through such programs, notwithstanding any Federal, State, or local law to the contrary."

76. When a Member with insurance fills a prescription at one of the Nation's ITU Pharmacies, that ITU Pharmacy creates an electronic claim for reimbursement. These claims are submitted in substantially the same way as a retail, non-ITU Pharmacy would submit a claim to a non-Member-patient's insurance plan (*see* Section V.B., *supra*): the ITU Pharmacy sends the claim to the switch, which then sends the claim to the appropriate PBM.

77. The Recovery Act requires the PBM to reimburse the Nation's ITU Pharmacy in the same way it would reimburse an in-network Pharmacy. *See* 25 U.S.C. § 1621e(a).

### 2. Defendants Are Subject to the Recovery Act

78. For almost every Member with insurance coverage, a PBM is responsible for managing that Member's *third-party* pharmaceutical benefits The PBM is thereby responsible for making payment decisions, issuing payment for claims, and issuing notice of declined reimbursement requests under the Recovery Act. Additionally, for almost every such Member with insurance coverage, the Nation is a payor of last resort with regard to the priority of the Member's insurance coverage provider. Thus, Defendants—as PBMs and insurance providers—are responsible third parties as contemplated under the Recovery Act, 25 U.S.C. § 1621e(a).

### C. Defendants Violate the Recovery Act

79. Despite the clarity of the Recovery Act, Defendants unlawfully violate the Recovery Act and subject the Nation to the profit-driven tactics that dominate Defendants' retail business. Defendants do so by denying claims for covered medications the Nation submitted on behalf of covered Member-patients.

80. In approximately 2015, the Nation's pharmacies began experiencing numerous and unprecedented claim denials from the CVS Defendants. The Optum Defendants followed suit in approximately 2017. Defendants began denying claims for many Members whose claims had, until that time, been processed and paid without issue. Simply, Defendants began denying claims for

covered drugs for reasons from which the Nation is federally protected. These "the drug is covered, but…" denials violate the Recovery Act and deprive the Nation of critical healthcare funding.

81.     PBMs routinely deny claims for *retail* pharmacy customers based on the customer's insurance plan rules. These denials are based on how/where the patient acquires the medication, not whether the medication is covered. For example, the PBM may deny the claim for (1) being filled by an out-of-network pharmacy; (2) being a drug that is subject to "forced mail order" rules in which the PBM must authorize and ship the medication from a specialty or mail-order pharmacy; or (3) being specialty and/or higher cost drug that can only be dispensed by an enrolled specialty pharmacy. These are just a few examples of circumstances in which a PBM may deny a claim submitted by a *retail* pharmacy (*i.e.*, "the drug is covered, but…" denials).

82.     The Recovery Act prohibits a PBM from denying claims submitted by an ITU Pharmacy for these reasons. Thus, while the PBM may permissibly deny an ITU Pharmacy claim for falling outside the respective administered plan's formulary (*i.e.*, "the drug is not covered" because it falls outside the formulary, is "over the counter," preferred therapeutic alternatives are available, etc.), the PBM may *not* deny the claim for any "the drug is covered, but…" reasons (*e.g.*, it must be filled by a specialty pharmacy, an in-network pharmacy, a mail order pharmacy, etc.).

83.     ITU Pharmacies are exempt from the "Specialty Pharmacy," "Mail Order," "Not-In-Network," and any other "the drug is covered, but…" denials; the PBM is required to reimburse the Nation for those claims at the equivalent of an in-Network, non-ITU Pharmacy. These denials, as applied to an ITU Pharmacy, would undermine the plain requirements of the Recovery Act. *See* 25 U.S.C. § 1621e. Failure to do so is a breach of the legal duty created by the Recovery Act.

84.     While these denials may further the PBM's retail profit strategies, they cut against the very fabric of the policies buoying ITU Pharmacies and Native American healthcare.

85.     Defendants violate the Recovery Act by failing to reimburse the Nation for the costs of goods and services provided by the Nation to Members and submitted to the PBM for reimbursement in accordance with 25 U.S.C. § 1621e.

## D.     Defendants Leverage Discount Programs to Unlawfully Hinder the Nation's Recoupment Benefit

86.     In a further violation of the Recovery Act, and in an effort to further reap ill-gotten profits from the Nation, Defendants impose their drug discount programs on the Nation's ITU Pharmacies. This creates an unlawful hinderance (*see* 25 U.S.C. § 1621e(c)[27]) on the Nation's ability to recoup its costs under the Recovery Act.

### 1.     Discount Programs Create Significant Profit for PBMs

87.     For years, the pharmaceutical industry has leveraged discount programs (or discount "cards") for prescription medications to defray the cost of prescription drugs and increase sales. Indeed, these programs have the ability to save cash-paying customers a substantial sum on costly medications. They allow the PBM to move certain drugs off their formulary and improve profit margins.

88.     The amount a retail customer ultimately pays for the discounted prescription drug under an applicable discount program usually has four cost components:

      a)     Negotiated Discounted Price;

      b)     Pharmacy Transaction Fee; and

---

[27] As set out in Section IV, *infra*, the Recovery Act provides: "[N]o provision of any contract, insurance or health maintenance organization policy, employee benefit plan, self-insurance plan, managed care plan, or other health care plan or program […] shall prevent or hinder the right of recovery of the United States, an Indian tribe, or tribal organization under subsection (a)." 25 U.S.C. § 1621e(c).

      c)     Transaction Fees.

In the ***retail*** setting, these costs and fees are passed on to the customer. Discount cards generate revenue, in part, through these fees, which can reach approximately $36.00 per transaction.

89.     Retail pharmacies accept drug discount cards from their patients and/or participate in PBM discount programs (the discounted cost notwithstanding) because, generally:

      a)     The pharmacy continues to earn a profit at the discounted price;

      b)     Customers purchase prescriptions they wouldn't otherwise purchase because of the discounted price;

      c)     The pharmacy builds customer loyalty (and avoids customer flight if they refuse); and

      d)     The pharmacy can drive non-prescription purchases through the same transaction.

Additionally, because large PBMs control the discount programs vis-a-vis large insurance contracts, pharmacies may ultimately breach their contract with a larger PBM if they refuse a discount program that PBM promulgates, even if the discount card results in a loss on the pharmacy's part in certain transactions.

90.     Essentially, when a patient visits a retail pharmacy with a prescription discount card or program information, the prescription discount is processed through the retail pharmacy's software system to the PBM in the same way the pharmacy would process the patient's insurance card. The PBM then returns the lowered price the pharmacy may charge the patient, along with the transaction fees the pharmacy must pay. The pharmacy often adds these transaction fees to the patient's copay. The card reduces the cost of the prescription drug to the patient, who pays the reduced cost along with administrative fees to the pharmacy. The PBM then seeks whatever compensation the drug manufacturer had promised it as remuneration for accepting the discount card.

91.      This framework simply does not apply to ITU Pharmacies, who traditionally ignored discount programs because they force ITU Pharmacies to incur a loss on Member transactions.

**2.      ITU Pharmacies Traditionally Ignored Discount Programs**

92.      Before approximately 2019, discount programs were effectively irrelevant to ITU Pharmacies. ITU Pharmacies do not charge Members any copays, so the cost of the drug *to the patient* was irrelevant. In other words, (a) a Member who pays no cost for a drug has no need to seek a discounted price, and (b) a pharmacy that does not charge Members has no need to participate in a discount program. ITU Pharmacies simply ignored discount programs because the fee structure actually often *increased* ITU Pharmacy costs (as the fees assessed in coordination with the discount, which are passed on to the customer-patient in the retail setting, are not assessed to a Member-patient and become the pharmacy's responsibility). Discount programs are unquestionably *more expensive* and less efficient for the ITU Pharmacy. They convey no additional benefit to the Member-patient. So, most ITU Pharmacies simply decline to enter discount program information into their system.

93.      This option was facilitated in part by the physical distinction and separation between a Member's private insurance benefits information and the discount program information (*i.e.*, this information was literally contained on separate ID or membership cards). So, the Nation could process the Member's insurance information for the purposes of the Recovery Act mechanism while ignoring any discount programs that would increase their costs or force them to incur a loss on a particular drug.

**3.      Defendants Inextricably Integrated Their Discount Program Information into Members' Insurance Information**

94.     In approximately 2019, Defendants integrated their drug discount program information with their plan membership ID cards, including those issued to Members. In the past, discount program information was wholly distinct from the Member's insurance information, which allowed an ITU Pharmacy to benefit from the Recovery Act while declining participation in costly discount programs. However, now, the discount program information is inextricably integrated with the Member-patient's insurance benefits information. The Nation has no effective way to separate them. This forces ITU Pharmacies to make a choice: either (a) take part in the discount programs at a loss, or (b) forgo the benefits of the Recovery Act on covered medications in the same transaction. This forced choice, for which the Defendants are wholly responsible, is an unlawful hinderance to the Recovery Act Mechanism in violation of 25 U.S.C. § 1621e(c).

### 4.     Defendants' Integrated Discount Program Information Forces the Nation to Either Pay or Forgo Recovery under the Recovery Act

95.     Today, the pharmacy automatically receives a log of all discount program medications coinciding to the PMS's non-formulary list. When the Nation's ITU Pharmacies enter a Member's insurance information for the purpose of recoupment, the PBM automatically receives a log of any discount programs applicable to the Member's transaction. This automatically triggers the application of the discount program, which impact drugs in the Member's transaction.[28] This discount information is coded into the Member's insurance information at the base level such that it cannot be segregated at the pharmacists' level. Thus, either (a) the ITU Pharmacist enters the Member's private insurance information into the system, which transmits information necessary to recoup the Recovery Act costs *and* information that triggers discount program fees if the

---

[28] Inherent in the understanding of this scheme is the fact that most patients who visit a pharmacy for a costly drug subject to a discount program are also receiving other covered medications in the same transaction.

Member has prescriptions for eligible drugs or (b) the ITU Pharmacist declines to enter the information, avoids potential discount program losses, but forgoes any potential recover under the Recovery Act.

96.     There is no reasonable method for the Nation to excise the information it needs to benefit from the Recovery Act from a Member's data without incurring the costs associated with discount programs that apply to the same transaction.[29]

97.     The only way for the ITU Pharmacy to avoid incurring fees associated with discount drug programs is to remove *all* insurance program information for the Member from its system and, thereby, forgo any possible recoupment under the Recovery Act for any covered medications that Member may have been prescribed and filled in the same transaction. Thus, Defendants' integrated discount card program undercuts the Nation's ability to benefit from the Recovery Act and thereby creates a hinderance to recovery in direct violation of the Recovery Act § 1621e(c).

98.     For example, consider the following array of medications prescribed to one of the Nation's Member-patients:

```
2     MEDROXYPROGESTERONE 15 JUL 2@15:40, FILL JAN 9@ Payable (9403686,00001)
3     MEDROXYPROGESTERONE 15 JUL 2@15:40, FILL APR 23@ Payable (9403686,00011
4     NOVOLOG *FLEXPEN*     JUL 2@15:40, FILL FEB 26@ Payable (9473012,00001
```

99.     Each of the drugs in the example above was prescribed to the same patient-Member. The Member had them filled at one of the Nation's ITU Pharmacies.

---

[29] While the Nation could conceivably inspect each claim by hand, doing so is entirely impractical, would create untenable cost and workflow burdens on the Nation, and would inexcusably hinder the Nation's right to recovery under the Recovery Act in violation of the plain language of the Recovery Act, 25 U.S.C. § 1621e(c).

100.    Drug #3—medroxyprogesterone—is an injectable and is usually denied as falling outside Defendants' various formularies.[30] However, in this example, Drug #3 is listed as "payable." A casual glance at the report would incorrectly suggest Drug #3 was covered under the Member's insurance plan. However, the drug is marked "payable" as a result of an automatic discount program encoded to the Member's prescription benefits. A careful review of the receipt data for this claim reveals the underlying violation of the Recovery Act:

| —Prescription— |
| --- |
| Additional Information 1: **CLAIM PAID DISCOUNT PROGRAM** |
| Authorization Number: 200244821203045996 |
| Basis of Reimb. Determination: Ingredient cost reduced to AWP less % |
| Dispensing Fee Paid:                              $     4.00 |
| Ingredient Cost Paid:                             $ 215.43 |
| Patient Pay Amount:                               $ 220.93 |
| Prescription/Service Ref Num: 9403686 |
| Prescription/Srvc Ref Num Qual: 1 |
| Response Status (Prescription): P |
| Total Amount Paid:                                $   -1.50 |
| Transaction Response Status: **CLAIM PAYABLE** |

The usual and customary charge[31] for Drug #3 is approximately $280.00. So, the PBM pays the ITU Pharmacy for the ingredient cost ($215.43) plus the dispensing fee ($4.00), which sums to a $219.43 credit to the ITU Pharmacy. The PBM effectively instructs the ITU Pharmacy to collect the "Patient Pay Amount"; but, in the ITU Pharmacy setting, the Member-patient does not pay. Rather, the ITU Pharmacy absorbs the Member-patient's copay (*i.e.,* the Patient Pay Amount of $220.93), which exceeds the credit by $1.50. This results in a ***negative claim***—the ITU Pharmacy

---

[30] Note, as explained above in Section V.B., this denial would be lawful, even under the Recovery Act, as the drug is not covered for *any* insured with the Member's same insurance plan.

[31] The "usual and customary" price reflects the cost of the drug to the consumer at the retail level, without the benefit of insurance. This is sometimes referred to as the "cash price".

*owes* the PBM $1.50 for dispensing this drug to the Member. The PBM then subtracts the $1.50 from the batch amount the PBM pays to the ITU Pharmacy during that period.

101.    A negative claim results when the ITU Member-patient's copay under the discount program exceeds the sum of the ingredient cost paid plus the dispensing fee. The ITU Pharmacy is thereby forced to pay the PBM for dispensing medications.

102.    The Nation's ITU Pharmacies have no way to (a) avoid the discount programs and their resultant administrative fees without (b) sacrificing their ability to recoup for other reimbursable services provided to the same patient-Member. While the ITU Pharmacy pays this *de facto* tax on its ability to recover under the Recovery Act, Defendants capture the high dollar transaction and administration fees while earning lucrative rebates from the manufacturer. None of these rebates are subsequently provided to the Nation to offset the cost of the hinderance. Defendants get their proverbial cookie *and* a glass of milk, while the ITU Pharmacy pays a fee to ensure benefits otherwise guaranteed by federal law. This is unlawful.

103.    To illustrate this conundrum, Drug #6 in the example above is insulin, and it is covered under the Member's insurance plan. It results in a covered, positive claim for the ITU Pharmacy worth approximately $962.00 in reimbursable funds through the Recovery Act mechanism. However, if the ITU Pharmacy wants to recoup that $962.00 for Drug #6, it must also pay the $1.50 fee attached to Drug #3. While this example ultimately results in a net positive reimbursement to the ITU Pharmacy, two improper realities are apparent: (1) the discount program has, in fact, resulted in net negative claims to the Nation's ITU Pharmacies whereby the Nation loses money by providing reimbursable services to Members and (2) the $1.50 fee is an unlawful hinderance to the Nation's ability to recoup under the Recovery Act under 25 U.S.C. § 1621e(c).

104.    The example of a $1.50 fee may appear marginal in a vacuum. But it is devastatingly consequential in the broad scope of the Nation's healthcare budget. That fee is replicated across thousands of claims in varying amounts, creating a real and substantial burden on the Nation's healthcare budget each year. There is no offset from the IHS or the Government in the event of recovery; the Nation loses the benefit these funds were intended to have on its healthcare program. This is unconscionable. Even more so now, with the stress of the COVID-19 Pandemic weighing on the Nation's healthcare system, Defendants demonstrate their malicious intent (or, at best, their reckless disregard for the rights and wellbeing of the Nation and Members) in perpetrating this scheme .

**E.      Defendants Continually and Intentionally Refuse to Repay the Nation**

105.    The Nation has repeatedly contacted Defendants with demands for (a) payment of wrongfully denied claims and (b) an explanation of the delay in payment of claims submitted pursuant to the Recovery Act. Despite the Nation's clear and persistent efforts, Defendants have not provided any reasonable or rational justification for their refusal to process and pay the Nation's legally authorized claims. For example:

a)      On April 19, 2016, the Chickasaw Nation Legal Division sent Thomas Moriarity, Executive Vice President and Chief Legal Counsel of CVS Health, a formal demand for explanation of its claims handling practices. CVS Health provided no reply.

b)      On June 17, 2016, the Chickasaw Nation Legal Division dispatched a second demand to Mr. Moriarity. Again, CVS failed to reply.

106.    The CVS Defendants have even paid lip service to a hollow plan to reimburse the Nation's ITU Pharmacies for these unlawfully denied claims. However, their prolonged inaction belies any real attempt to resolve the problem.[32]

---

[32] IHS and CVS Caremark agreed to a pilot program to develop new claim payment rules. This included two pilot sites (Phoenix Indian Medical Canter and Chickasaw Nation). On April 30,

107.    Defendants intentionally and recklessly ignore their obligations under federal law and wrongfully withhold funds that are rightfully payable to the Nation and benefit therefrom.

108.    Remarkably, the CVS Defendants have addressed this issue with regard to Medicare Part D. The CVS Defendants are the largest Medicare Part D administrator in the U.S. To avoid conflicts with CMS, the CVS Defendants execute an ITU addendum as part of its Medicare Part D agreements. This ITU addendum avoids improper denials of claims for recoupment for services the Nation provides to Medicare-insured Members. This addendum shows that the CVS Defendants demonstrably know exactly what they need to do to properly adjust the Nation's claims for services to Members. Thus, Defendants have demonstrated a patent and unrelenting resolve to continue profiting—both intentionally and unlawfully—at the expense and detriment of the Nation.

**F.    Defendants' Conduct Impairs the Quality of the Nation's Healthcare Program**

109.    The unlawfully denied claims Defendants continue to refuse to pay represent a significant burden on funding for the Nation's healthcare program. Defendants' unlawful conduct cuts against federal mandates in support of the health and well-being of Native Americans.

110.    Further, Defendants' callous disregard of the Nation's requests for resolution is unconscionable and makes clear that Defendants value only their bottom line, and that Defendants have no intention of complying with federal law—all at the expense of the Nation, its Members, IHS, and the American taxpayer.

111.    Defendants have thereby created a serious hazard to the public—those Members dependent on the Nation's healthcare system for their health and wellbeing—by means of their

---

2018, The Nation submitted 72,557 unjustly denied claims to CVS Caremark through the email portal CVS Caremark established for that purpose. To date, the Nation has received no response. This "pilot program" is yet another strawman in the CVS Defendants' attempt to avoid repayment.

misconduct. They have profited greatly in withholding the Nation's funds. They have done so for years without recourse. They have hidden behind false pretenses of remedies with full and unhindered awareness of their conduct and its impact on the Nation. They have flippantly ignored the Nation in its attempts to resolve these issue without litigation. They have leveraged their vast conglomerate in an attempt to subject the Nation to its profit-driven whim. This pattern of conduct demonstrates a reckless disregard for the rights of Native Americans. It demonstrates intent and malice on Defendants' part warrants an award of punitive damages under 20 Okla. Stat. § 23-91.

112.    In unlawfully retaining these funds, Defendants knowingly pocketed an essential funding source for the Nation's healthcare system. Defendants' unlawful conduct continues today.

## VI.    COUNTS

**COUNT ONE: Statutory Liability Under 25 U.S.C. § 1621e**

113.    The Nation fully incorporates into this paragraph each and every allegation in the preceding paragraphs of this Complaint as if each were fully stated herein for its additional claims against Defendants and further alleges as follows:

114.    The Nation constitutes an "Indian tribe" as defined in 25 U.S.C. § 1603(14) and as required in 25 U.S.C. § 1621e(a). Alternatively, the Nation constitutes an "Urban Indian Organization" under 25 U.S.C. § 1621e(i). The Nation thereby has standing to bring this lawsuit against Defendants pursuant to 25 U.S.C. § 1621e(e).

115.    Under 25 U.S.C. § 1621e(a), the Nation is entitled to recover from Defendants the reasonable charges they billed in providing health services or, if higher, the highest amount Defendants would pay for care and services furnished by providers other than governmental entities, to any individual to the same extent that such individual, or any nongovernmental provider of such services, would be eligible to receive damages, reimbursement, or indemnification for such charges or expenses if (1) such services had been provided by a nongovernmental provider; and

36

(2) such individual had been required to pay such charges or expenses and did pay such charges or expenses.

116.   The Nation submitted timely claims for reimbursement under 25 U.S.C. § 1621e to Defendants.

117.   Defendants refused to reimburse the Nation in accordance with 25 U.S.C. § 1621e.

118.   Defendants are therefore in violation of 25 U.S.C. § 1621e and liable to the Nation for the value of these unrecouped funds.

119.   In addition to the value of these unrecouped funds, Defendants are liable to the Nation for attorney's fees and costs of litigation. 25 U.S.C. § 1621e(g).

**COUNT TWO: Negligence Per Se (or, alternatively, Negligence)**

120.   The Nation fully incorporates into this paragraph each and every allegation in the preceding paragraphs of this Complaint as if each were fully set forth herein for its additional claims against Defendants and further alleges as follows:

121.   The negligence per se doctrine is employed in Oklahoma to substitute statutory standards for parallel common law, reasonable care duties. The Court may adopt statutory standards for causes of action for negligence such that Defendants' violation of the statute constitutes negligence per se.

122.   Defendants' violation of 25 U.S.C. § 1621e caused the Nation's injuries, as described in detail herein.

123.   The Nation's injuries include but are not limited to

    a)    Defendants' denial of funds owed to the Nation pursuant to the recoupment mechanism of 25 U.S.C. § 1621e; and

    b)    Defendants' unlawful hinderance of the Nation's use of and benefit from the recoupment mechanism of 25 U.S.C. § 1621e.

124.     Defendants' conduct is precisely the kind of conduct 25 U.S.C. § 1621e was designed and enacted to prevent. Defendants' conduct is directly contrary to the express purpose of the statute and its intended outcomes. The statute provides positive, objective standards for conduct on Defendants' part (which Defendants have violated). The standard of duty 25 U.S.C. § 1621e prescribes is fixed and defined by law; it is the same in all circumstances.

125.     The Nation, as well as the Members (a) to whom the Nation provided protected services and (b) for whom the Nation sought reimbursement from Defendants are members of the class of persons 25 U.S.C § 1621e (as well as the larger statutory construct of the IHCIA) are designed to protect.

126.     Defendants' conduct constituted a breach of duty owed to the Nation as a matter of law.

127.     Alternatively, at all relevant times, Defendants' owed a duty to the Nation and Members to comply with the federal laws protecting Members' rights to healthcare and the Nations' ability to provide that healthcare at no cost. A reasonable actor, in Defendants' position, would have afforded the respect these laws deserve and complied with them.

128.     Defendants breached this duty by violating 25 U.S.C. § 1621e as described throughout this Complaint.

129.     Defendant's breach of duty proximately caused the Nation's injuries in a foreseeable way. At all relevant times, Defendants should have known the harm their wrongful denials would cause. Defendants, as sophisticated providers of pharmacy and PBM services, were on notice of the rules governing reimbursements of ITU Pharmacies. Furthermore, the Nation put Defendants on notice of their wrongful denials and demanded both reimbursement and an explanation.

130.     Defendants conduct was in reckless disregard for the lives, wellbeing, health, and safety of Native Americans, especially those Members dependent on the Nation for health services. Defendants acted intentionally, with malice, in wrongfully withholding the Nation's funds, subjecting it to oppressive discount programs, hiding behind false promises of remedies and pilot programs, and through other reckless and/or intentional conduct. Defendants are therefore liable to the Nation for punitive damages.

131.     As a result of Defendants' wrongful conduct, the Nation has been harmed. Defendants have deprived the Nation of essential revenue for its healthcare program. Defendants have hindered the Nation's ability to generate that revenue through 25 U.S.C. § 1621e.

**COUNT THREE: Unjust Enrichment**

132.     The Nation fully incorporates into this paragraph each and every allegation in the preceding paragraphs of this Complaint as if each were fully set forth herein for its additional claims against Defendants and further alleges as follows:

133.     Defendants' conduct warrants a judgment disgorging Defendants of any ill-gotten gains they acquired from their wrongful and unethical business practices.

134.     Defendants wrongfully denied claims for recoupment under 25 U.S.C. § 1621e and thereby continue to unlawfully withhold and retain funds rightfully belonging to the Nation.

135.     Defendants have taken unfair and/or undue advantage of the Nation by, *inter alia*, wrongfully denying claims for recoupment, failing to implement a system that appropriately treats the Nation's claims, and forcing the Nation to seek the legal remedies and relief requested in this Complaint.

136.     Defendants fully appreciated the enrichment and benefit accorded to them by retaining monies that should have been paid to the Nation.

137.     Defendants' retention of monies that should have been paid to Plaintiff acted to benefit Defendants at the Nation's express detriment.

138.     Defendants' retention of monies that should have been paid to the Nation under the circumstances as set forth in this Complaint constitutes not only acts of misconduct, but also conduct that is patently unfair, unjust, inequitable, dishonest, and fraudulent in relation to the Nation.

139.     For the above stated reasons, Defendants, and each of them, were unjustly enriched to the express detriment and disadvantage of the Nation.

140.     Defendants should not be allowed to retain any part of the amounts they should have paid to the Nation.

**COUNT FOUR: Injunctive Relief**

141.     The Nation fully incorporates into this paragraph each and every allegation in the preceding paragraphs of this Complaint as if each were fully set forth herein for its additional claims against Defendants and further alleges as follows:

142.     The Nation seeks injunctive relief as contemplated by 25 U.S.C. § 1621e(e).

143.     Unless enjoined by this Court, Defendants will continue wrongfully denying the Nation's claims in the future.

144.     Defendants' wrongdoing is ongoing and injuries in the future to the Nation are irreparable in that Defendants have demonstrated a blatant disregard for federal law and a persistent desire to retain funds rightfully owed to the Nation.

145.     There is no adequate and complete remedy at law for Defendants' continuing wrongful claim denials.

146.     The Nation requests the Court enter a permanent injunction ordering Defendants to

a)     comply with 25 U.S.C. § 1621 in all respects;

b)       open an inquiry into all claims the Nation has submitted for re-assessment; and

c)       institute a claims management process that affords ITU Pharmacies the right to recoup funds as provided under the law.

**COUNT FIVE: Declaratory Relief**

147.      The Nation fully incorporates into this paragraph each and every allegation in the preceding paragraphs of this Complaint as if each were fully set forth herein for its additional claims against Defendants and further alleges as follows:

148.      The Nation seeks declaratory relief pursuant to 28 U.S.C. § 2201 and as contemplated by 25 U.S.C. § 1621e(e).

149.      The Nation seeks the following declarations:

a)       That Defendants have acted in violation of 25 U.S.C. § 1621e;

b)       That Defendants are obligated to pay the Nation claims in accordance with 25 U.S.C. § 1621e(a);

c)       That Defendants' use of discount programs unlawfully hinders the Nation's ability to avail itself of 25 U.S.C. § 1621e;

d)       That all monies obtained from the Nation as a result of Defendants' discount program fees have been unlawfully obtained by Defendants from the Nation; and

e)       That Defendants must provide an accounting to the Nation of all fees received from Plaintiff in connection to Defendants' discount program.

## VII.      PRAYER FOR RELIEF

WHEREFORE, premises considered, the Nation respectfully prays for judgment in its favor and against Defendants, jointly and severally, as follows:

a)       Damages as set out in COUNTS ONE and TWO or, alternatively Disgorgement as set out in COUNT THREE;

b)       Injunctive Relief as set out in COUNT FOUR;

c)       Declaratory Relief as set out in COUNT FIVE;

d)      Attorney's Fees and Cost of Litigation; and

e)      Any other relief this Court deems proper.

### VIII.      JURY DEMAND

PLAINTIFF, The Chickasaw Nation, demands a trial by jury of all issues so tribal

pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully Submitted,                    /s/*Michael Burrage*
                                           Michael Burrage, OBA #1350
                                           Reggie Whitten, OBA #9576
                                           Patricia Sawyer OBA #30712
                                           **WHITTEN BURRAGE**
                                           512 N. Broadway Avenue, Suite 300
                                           Oklahoma City, Oklahoma 73102
                                           405.516.7800 office
                                           405.516.7859 fax
                                           rwhitten@whittenburragelaw.com
                                           mburrage@whittenburragelaw.com
                                           psawyer@whittenburragelaw.com

                                           ***Attorneys for the Chickasaw Nation (Plaintiff)***